**No. 60190.**—Joseph Poli Company v. United States, protest 157369–K (Pittsburgh).

DONLON, Judge: The previous submission of this case was set aside by stipulation, and the case has been resubmitted to the third division as now constituted.

The articles covered by the protested entry include a marble communion railing, a side altar, and a predella with steps, all imported from Italy on July 22, 1947, and entered as duty free under paragraph 1774 of the Tariff Act of 1930. On liquidation, the collector denied free entry and assessed the articles as manufactures of marble, dutiable at 50 percent ad valorem, under paragraph 232 (d) of the Tariff Act of 1930. The claim on which plaintiff relies is for free entry under paragraph 1774. Other claims that were made in the protest have been abandoned and need not be considered.

The entry was made in the name of Joseph Poli Company, of Pittsburgh, Pa., a partnership, as importer of record. Old paragraph 1774, as it was effective on July 22, 1947, under which these articles were entered, provided that religious articles, to be entitled to duty-free entry, are those imported for presentation (without charge) to, and for the use of, a corporation or association organized and operated exclusively for religious purposes. By legislation, effective June 12, 1952, paragraph 1774 was amended so that it is no longer necessary, as a basis for duty-free entry of religious articles for church use, to prove that the articles were "imported in good faith for presentation (without charge)" to a religious corporation or association. However, that amendment does not govern in this case.

Pursuant to section 10.51 of the customs regulations, the importer filed a declaration in support of the claimed free entry, stating that the articles were expressly imported for presentation to the religious institutions named as the donee of each imported article. Also filed with the entry were letters of presentation from the respective donor or donors, identifying each item donated, as well as letters of acceptance, in each instance, from the donee religious institution.

Only one witness testified at the trial. Mr. Henry Poli, partner of Joseph Poli Company, testified for the plaintiff. His testimony relates to the importation and installation of these articles in the several religious institutions, in connection with the claimed free entry under paragraph 1774.

At the trial, plaintiff offered no proof in support of the claim for free entry of the predella and steps, and, in the record (p. 13), plaintiff abandoned the claim for free entry as to those items.

The marble communion railing was imported for and installed in St. Joseph's Church, Duquesne, Pa. The letter of presentation, dated July 17, 1947, was put in evidence without objection, exhibit 1. It bears the signatures "Estate Agnes Rahe," "Mary Fey," "Catherine Fey," and "Cecelia Snyder." The letter of acceptance is dated July 21, 1947, is signed by the pastor of St. Joseph's Church, and is addressed to those identified as signatories in the letter of presentation. Mr. Poli testified, at the trial, that he had conversations about the marble communion railing with the several donors, in the presence of the pastor of the church. The drawings for the communion railing were approved by the donors, and Mr. Poli stated that, during these conversations, he was informed that the people present were the donors of the marble communion railing. The Joseph Poli Company received $3,000 directly from the donors, in payment for the communion railing.

On cross-examination of this witness, defendant brought out that St. Joseph's Church had a contract with Joseph Poli Company for the purchase and installation of various articles, at a total cost of $23,000. However, it appears also that the marble communion railing was imported and installed outside this contract. The communion railing cost $2,600, and $400 in excess was paid by donors, presumably to cover in part the cost of installing the communion railing.

The side altar covered by this entry was imported and installed in the Church of the Assumption in Pittsburgh. The letter of presentation filed for this item

is in evidence without objection (exhibit 2). It is signed by F. W. Ries, Jr., as donor. As to this item, the witness testified that he received $6,000 directly from Mr. Ries in payment for two altars, including the one in this case, and for four statues covered by another protest (protest 153001–K). Mr. Poli testified that he had several conversations with Mr. Ries in the presence of the pastor of the church, when he discussed the architect's design and execution for installation of these altars.

Defendant, in its brief, argues that the facts in the record do not support a donation with respect to the marble communion railing. As to the imported side altar, defendant contends that the donor, Mr. Ries, made a donation of money to the church and that he did not donate the altar. In support of this argument, defendant points out that the total amount of $6,000, which was paid to Mr. Poli by Mr. Ries, far exceeds the total cost of all articles allegedly donated by Mr. Ries to the church, estimated by defendant to be approximately $5,200. Defendant argues that the case of *United States* v. *Dr. Oidtmann Studios, Inc., et al.*, 31 C. C. P. A. (Customs) 116, C. A. D. 260, is controlling of the issues in this protest. Our appeals court there held that the language of old paragraph 1774 requires that the donor, at the time of importation, shall have such a relationship to the imported articles, either directly or by his agent, that he could exercise control over the articles.

Plaintiff relies on the case of *Don Bernardo Hammerstein* v. *United States*, 27 Cust. Ct. 147, C. D. 1360, in support of the claim for free entry under paragraph 1774. That case, distinguishable from the *Oidtmann* case on the facts, is entirely consistent with the legal test there laid down. This court, in the *Hammerstein* case, found that the donor had continuing interest in the approval of design and installation of the religious articles before money was paid to the pastor for their cost. On those facts, this court held that the donor had conducted himself as one presenting a gift of particular religious articles, and that, in law, he had given not a mere sum of money, but the very religious articles that were installed.

The weight to be given to the letters of presentation that are in evidence without objection, as proof of the facts recited, is an issue for us to consider. *United States* v. *Borgfeldt & Co.*, 11 Ct. Cust. Appls. 129, T. D. 38934; *Borgfeldt & Co.* v. *United States*, 11 Ct. Cust. Appls. 421, T. D. 39433. The facts recited in the affidavits of the respective donors, filed both as to the marble communion railing and the side altar, are uncontradicted in the record. Mr. Poli's testimony that the donors approved the drawings and paid him directly sums of money, in excess of importation costs, is substantiating proof, consistent with the donation of the articles that is stated in the letters of presentation, identifying the donors.

We are of opinion that payment by the donors of sums in excess of importation cost of the articles donated is not necessarily inconsistent with a donation, particularly where the record connects the donors with concern as to installation as well as importation.

The record both as to the marble communion railing and the side altar is, in our opinion, sufficient to overcome the presumption of correctness that attaches to the collector's classification, and the defendant has offered no proofs in rebuttal.

The protest is sustained as to the communion railing and the side altar and is overruled as to all other items.

Judgment will be rendered accordingly.

### DISSENTING OPINION

JOHNSON, Judge: In this case, it is claimed that a marble communion railing and a side altar imported from Italy on or about July 6, 1947, are entitled to free

entry under paragraph 1774 of the Tariff Act of 1930, as articles, imported for presentation (without charge) to, and for the use of, corporations organized and operated exclusively for religious purposes. Other claims made in the protest have been abandoned. The decision of my colleagues has allowed the claim as to the communion railing and the side altar, but, in my view, the evidence is insufficient to support the claim.

The pertinent paragraph of the tariff act, as it appeared prior to its amendment (which is not applicable to the instant merchandise), provided:

PAR. 1774. Altars, pulpits, communion tables, baptismal fonts, shrines, or parts of any of the foregoing, and statuary (except casts of plaster of Paris, or of compositions of paper or papier-mâché), imported in good faith for presentation (without charge) to, and for the use of, any corporation or association organized and operated exclusively for religious purposes.

The statute was construed in *United States* v. *Dr. Oidtmann Studios, Inc.*, 31 C. C. P. A. (Customs) 116, C. A. D. 260, wherein the court said (p. 123):

* * * Congress in clear and unambiguous language provided in paragraph 1774 that to come within its provisions the articles therein named must have been imported "in good faith for presentation (without charge)" to a religious organization. This language clearly requires that a donor must at the time of importation have such relationship to the imported articles, either directly or by his agent, that he could *exercise control over the articles*, for without such control they could not be presented by him without charge to a religious organization. [Italics supplied.]

In that case, there was a contract between Dr. Oidtmann Studios and the congregation of the St. Louis Cathedral for the purchase and installation of the structural parts of a main altar and two side altars. There was in evidence a letter signed by Father Anderson presenting the altars to the cathedral. According to Father Anderson's testimony, he was asked to make a donation and agreed to do so, provided a tablet were put up in honor of Bishop Laval. He donated the money, with which the cathedral paid the studios. The court held that Father Anderson had made a donation of money, not altars; that he had never had title to, possession of, nor dominion over the imported articles and could not have made a presentation of them to the cathedral without charge.

Free entry was allowed in the case of *Don Bernardo Hammerstein* v. *United States*, 27 Cust. Ct. 147, C. D. 1360, where it appeared that the donor authorized the pastor of the church to act for him; conferences were had between the pastor and the donor every week; the donor passed upon the designs; the pastor received his approval, before proceeding with each step; the money was not turned over to the pastor to pay for the articles until the work was well advanced.

In a more recent case, *Westfeldt Brothers* v. *United States*, 36 Cust. Ct. 112, C. D. 1760, free entry was not allowed where it appeared that the contract of purchase of the articles was made by the bishop and could not have been canceled without his consent; payment was made upon completion of the work to his satisfaction; while the chancellor had been appointed agent of the donors, his only authority was to collect funds and pay for the work; neither the donors nor the chancellor had title to, possession of, nor dominion over the imported articles.

At the trial herein, there was received in evidence a letter, dated July 17, 1947, signed by "Estate Agnes Rahe," Mary Fey, Catherine Fey, and Cecelia Snyder, stating that they take pleasure in presenting to St. Joseph's Church, Duquesne, one marble communion railing, "which we have asked the Joseph Poli Company to import from Italy."

Henry Peter Poli, architect and a partner in the Joseph Poli Company, testified that a conversation with the donors was held in the presence of Father Fehrenbach of St. Joseph's Church. He said that the substance of the conversation was "the approval of the drawings for the communion railing which they were donation

*sic*]." Nothing was said then about payment, "only that they were the donors." At that time, the witness did not know the price. He also stated that checks, totaling $3,000, were received directly from the donors in payment for the communion railing and part of the installation. The entered value of the communion railing was $2,600, but, according to the witness, it may have cost the firm even less. There were other items which the church had agreed to buy, as to which the witness testified:

X Q. So that the church was indebted to you in excess of the cost of the Communion railings?—A. Yes, for other work executed.

X Q. So that this payment of $3,000 which you received, $2,000 and $1,000, went for the cost of the Communion railing plus part of the balance which the church owed you?—A. Correct.

X Q. The difference was made up by the church?—A. Correct.

X Q. Now, was the sum that the church agreed to pay you, was that predetermined between you and the church prior to the delivery of these items?—A. No. We had to find out the cost of the railing. ·

X Q. After you found out the cost and that was I presume before delivery?—A. Yes.

X Q. You then submitted a statement or an estimate of what you desired or what you wanted; what you required for all these things that had to be done?—A. Correct.

X Q. And then the church agreed to pay you that sum, is that correct?—A. Yes, correct.

\* \* \* \* \* \* \*

X Q. Then you got payments; you got $3,000 from these people and the balance from the church?—A. Specifically for those items.

X Q. And, when those payments were completed, that discharged the obligation of the church for the price they agreed to pay you for the entire thing, is that correct?—A. Certainly.

The side altar covered by this entry was installed in the Assumption of the Blessed Virgin Mary Church, Bellevue, Pa. There is in evidence a letter, dated February 11, 1947, signed by F. W. Ries, Jr., stating that the undersigned takes pleasure in presenting to the church two marble side altars, "which we [*sic*] have asked the Joseph Poli Company to import from Italy."

The witness Poli testified that Ries gave him a check for $6,000 for two side altars and four statues (involved in a companion case, protest No. 153001–K). He had conversations with Ries in the presence of Father Hinnebusch "discussing the architect's design and the execution of the work."

In my view, the meager record presented is insufficient to meet the requirements of the statute. The only evidence which even tends to indicate that the donors had anything to do with the importation of the merchandise are the letters of presentation, which refer to the articles "which we have asked the Joseph Poli Company to import from Italy." These letters have little or no value as evidence that the donors imported the merchandise. It is to be noted that the letter signed by Ries uses the word "we," even though there is only one donor. Evidently, the letters were prepared by the same person and given to the donors for signature. On the letter referring to the communion rail, it is doubtful whether the signature "Estate Agnes Rahe" is of any validity, since the name of the executor, administrator, or trustee is not given. At the opening of the hearing, counsel for the plaintiff stated that Mary Fey paid the sum of $2,000 and Cecelia Snyder the sum of $1,000 for the communion railing. In the testimony, reference is made to "the donors." It is, therefore, not clear whether or not Catherine Fey and a representative of the Estate of Agnes Rahe took part in any conversations in regard to the merchandise or that they actually donated any money. Under these circumstances, the statement in the letter of presentation does not establish that

the four donors named imported the articles for presentation to the church or that the Joseph Poli Company was acting as their agent for that purpose.

While the payments in the instant case were made directly to the Joseph Poli Company, it is evident from the testimony quoted above that the company looked to the church for payment and that its agreement was with the church. The church engaged Poli and agreed to pay him; the donors gave sums of money, part of which was used for the particular items involved herein. There is nothing to show that they had anything to do with selecting the merchandise, approving the designs, or making any suggestions about it. They, or some of them, were apparently present at certain conversations in regard to the design and execution of the work, but there is nothing to show that they had any right to approve or disapprove what was done.

The testimony as to the side altar claimed to have been imported by Mr. Ries is inconclusive. As stated above, the letter signed by him is written in the plural and is evidently a form letter. It refers to two marble side altars, but only one is involved herein. His payment to the Joseph Poli Company was in the sum of $6,000, but the altar in this case was valued at $2,000. Reference is made to four statues in the companion case (protest No. 153001–K). It was held in that case that the evidence was insufficient to identify Mr. Ries as the donor of those four statues. In the instant case, Mr. Poli testified that the church had been undergoing extensive repairs; that various people had contributed sums of money; and that Mr. Ries was the largest single contributor. All of this indicates that Ries' donation was a sum of money given to the church, part of which may have been used for the purchase of the side altar here involved. The evidence does not establish that Ries imported that particular article for presentation to the church nor that the Joseph Poli Company was acting as his agent for that purpose.

The donors herein made a gift of money, not articles. There is nothing to show that they ever had title to, possession of, or dominion over the articles. Therefore, the articles are not entitled to free entry under paragraph 1774 as articles *imported for presentation* (without charge) to, and for the use of, religious institutions.

The protest herein should be overruled as to all items.